Mordecai T. Endicott et al.

*v.*

Philip I. Marvel et al.

[Heard November 1st, 1912. Decided May 16th, 1913.]

1. Where directors of a corporation, being five of the seven members of the board, make loans of money to it upon collateral notes in the usual form executed by it to them for the money so loaned, thereby pledging as security certain shares of its stock then held in trust for it, and afterwards when the notes fell due an engagement was entered into at a meeting of the board of directors between the corporation and these same five directors to the effect that the corporation should have one year's time in which to redeem the collateral by paying back the money, failing in which the collateral should thereby become the absolute property of the directors who made the loans and the indebtedness of the corporation should be discharged, and said collaterals were applied accordingly, said directors will be compelled to account by returning the stock to the·trustee from whom they received it, and to the treasury of the corporation the dividends they have received thereon, and upon doing so the money they loaned with interest will be decreed to be paid to them.

2. A contract between a pledgor and pledgee of the nature stated, without a new or separate consideration, is void on grounds of public policy and inoperative to terminate the equity ·of redemption.

3. But assuming that no legal obstacle exists to prevent a pledgor from contracting with his pledgee that in consideration of an extended time for payment the pledge shall automatically become the property of the pledgee in the event of failure to pay at the time agreed upon, providing the contract be found fair, open and intelligent, yet such a trans-

action necessarily demands the closest possible scrutiny of a court of equity whose especial duty it is to guard and preserve equities of redemption against harsh or unconscionable conduct of creditors toward their debtors.

4. The law denies to directors of a corporation who are its creditors holding collateral security the right in effect to foreclose the equity of redemption of the corporation in the collateral without adequate notice to the corporation which they represent.

5. Laches is a defence only when the stockholder with a full knowledge of the facts has delayed an unreasonable length of time in bringing his action. These two elements, knowledge and delay, are the essential elements of the defence. Until the stockholder has full and complete knowledge of all the essential facts which would be likely to induce him to institute the action, the beginning of the time from which laches will run cannot be said to commence.

6. The fact that some of the complainants who have joined in the bill are found to own stock the title to which has passed through former owners to whom laches may be attributed can afford no bar to the assertion of the rights of the corporation by the other complainants to whom no laches can be attributed.

---

The amended bill herein has been filed by certain stockholders of the St. Leonard's Land Company for the benefit of that corporation. The relief sought is against five of its seven directors. The corporation is joined as a defendant because the board has refused to authorize the suit.

The controversy arises through loans of money made to the corporation by the five defendant members of its board of directors. The directors who made the loans each received from the company to secure the loans certain collaterals, which collaterals have since been applied in satisfaction of the loans. The amended bill seeks to enforce the restoration of these collaterals and an accounting.

In May, 1898, the corporation was in pressing need of money. At that time certain capital stock of the corporation (which stock is conceded to have been fully paid) was held by an individual in trust for the corporation for purposes of sale by the corporation for its use. May 19th, 1898, a resolution of the board was adopted authorizing the president and treasurer to borrow for the corporation $10,000 and to cause double that amount of the trust stock above referred to to be pledged as security for the loan. The resolution is vaguely worded, but

its meaning has been made reasonably clear. Failing to find any person outside the board willing to make the loan, five members of the board—defendants herein—each loaned the corporation $1,500 and received therefor collateral notes of the corporation pledging thirty shares (par $3,000) · of the trust stock already referred to. The other two members of the board refused to make similar loans. The money so borrowed was used to pay debts of the corporation. The minutes of the board disclose no resolution specifically authorizing these loans and pledges, but the testimony indicates that such a resolution may have been adopted at about the time the loans were made. The minutes are, in fact, so inadequately kept that they afford little light touching the transactions of the board. The notes were severally dated June 20th, 1898. To one of the directors who made a loan no note appears to have been given, but stock was issued to him to secure his loan. Under date of October 15th, 1898, shortly before the notes matured, the minutes of the board disclose the following resolution as having been adopted:

"Resolved that each director borrow the sum of fifteen hundred dollars for the period of· one year, and to receive fifty per cent. excess of the company's stock as collateral to said loan, to meet the obligation of Alvin P. Risley, contractor. The company to have the privilege of redeeming said stock in one year from date with interest at six per cent. otherwise to revert to the borrower."

This minute, like many others found in the minute book, is almost unintelligible, standing alone. It appears to authorize an original loan for one year, whereas the loan had been already made by five members of the board and the remaining two members, who were not present at that meeting, had positively refused to loan. The amount of collateral referred to in the resolution is fifty per cent. excess, whereas the amount which had been already given was one hundred per cent. excess. The resolution is also silent touching the amount to be credited to the company for the collateral in the event of the company failing to redeem it. The testimony of the directors who made the loans, and who were all present at this meeting, is that the resolution which was adopted was to enable the company to have one year in which to redeem the stock which had already been pledged, failing in which the stock should then become the absolute property of the

pledgees and the indebtedness of the company became thereby discharged. The testimony of one of the directors who made no loan is to the effect that he never knew of any action of the board limiting the period of redemption until shortly before the bill was filed, and that he had, from time to time, urged at board meetings the redemption of the stock. The earliest date at which he could positively state he so urged at a board meeting was in the year 1902. No further action touching these loans appears to have been taken by the board before February, 1904, and a dispute exists touching the action which it is claimed was taken by the board at that time. It is claimed that at that time a redemption of the stock of the company was urged by the two "dissenting" members of the board and resisted by the five members who had made the loans, and that one of the dissenting members then offered a compromise resolution to the effect that one-half of the pledged stock should be surrendered and the remaining portion retained by the pledgees, to the end that the amounts paid by the several pledgees should be the par value of the stock by them retained. The testimony touching the compromise resolution is in hopeless conflict. The two dissenting members of the board testify that the resolution passed with one of them voting against it. The other members of the board testify that no such resolution was ever adopted. It is probably impossible to state, with entire certainty, what the truth may be touching this resolution. Its absence from the minute book is of little or no probative force in view of the way the minutes were kept. None of the transactions herein referred to have at any time been brought to the attention of a stockholders' meeting of the corporation. At a meeting of the board August 17th, 1909, a further demand for the return of the pledged stock was peremptorily refused and permission to permit suit to be brought by the company was also denied. This suit is therefore brought by stockholders in behalf of the corporation to enforce the rights of the corporation.

*Mr. Allen H. Endicott* and *Mr. Joseph H. Gaskill,* for the complainants.

*Messrs. Bourgeois & Coulomb* and *Mr. Robert H. McCarter,* for the defendants.

LEAMING, V. C.

It will be observed that present conditions have arisen from two several transactions authorized by the board of direcors of the corporation in which complainants are stockholders. The first transaction was a loan to the corporation by five of the seven members of its board. The notes of the corporation which were executed for the money so loaned were collateral notes in the usual form pledging as security the stock here in question. No objections to that transaction have been urged by complainants. The corporation was in urgent need of the money and efforts to procure the loan from others, with the same collateral, had failed. The second transaction occurred when these notes fell due. That transaction was an engagement entered into at a meeting of the board between the corporation and these five directors to the effect that the corporation should have one year's time in which to redeem the collateral by paying back the money, failing in which the collateral should then become the absolute property of the directors who made the loans, and the indebtedness of the corporation should be thereby discharged.

It will be perceived that this was an engagement made by the corporation, through the medium of its board of directors, with members of its board, touching property of the corporation. The infirmities of such a contract which arise from the circumstance that it is made by the board with members of the board have been repeatedly defined in this state. Such contracts are not void by reason of the circumstance stated; they are voidable. They cannot be enforced, as such, against the will of the corporation, promptly asserted. Enforceable obligations of the corporation may arise from the transaction—such as an obligation to repay money loaned—but cannot arise from the convention as against the promptly asserted will of the corporation.

There will be found in reported cases statements to the effect that a contract voidable because made between a corporation and its directors may be avoided or repudiated by the corporation at the instance of a stockholder; the suggestion being that upon a bill being promptly filed by a stockholder in behalf of the corporation the voidable contract becomes thereby void and its contractual force destroyed. It seems clear that this view, if it can

be said to have at any time been entertained in this state, cannot be longer accepted consistently with the principles defined by our court of errors and appeals in *United States Steel Corporation* v. *Hodge, 64 N. J. Eq. (19 Dick.) 807.* It is there pointed cut that where the only infirmity of a contract is the single circumstance that it has been made by a board of directors acting in behalf of the corporation, with members of the board, the power to sanction such a contract belongs to the stockholders in stockholders' meeting assembled. Indeed, that power is everywhere recognized, even to the extent of holding that the failure of stockholders' meetings to promptly repudiate the contract on the ground stated after adequate notice at such meetings is operative to affirm the contract. If the option to affirm or disaffirm a contract which is voidable because made by the corporation, through the medium of its board of directors, with or for the benefit of members of the board, resides in the body of stockholders, it seems obvious that a single stockholder cannot exercise that option and render the contract void by the mere act of filing a bill for that purpose; if the option resides in the stockholders, clearly it cannot be exercised by less than all the stockholders except in a stockholders' meeting. In the present case the corporation has not asserted its option to either sanction or repudiate this engagement touching the collateral here in question; the transaction has at no time been brought to the attention of a stockholders' meeting. Any presumption of ratification by the corporation arising from mere lapse of time becomes impotent when it affirmatively appears that no stockholders' meeting has ever been apprised of the transaction. It may therefore be here assumed that the power of affirmance or disaffirmance still resides in the body of stockholders so far as that power is dependent upon the mere circumstance that the engagement in question was with directors instead of with disinterested third parties.

But there are engagements which may be made by directors of a corporation with themselves in behalf of the corporation which ratification or even express sanction of the majority of stockholders at a stockholders' meeting cannot support against the will of a single dissenting stockholder. In cases of that nature (as well as in cases of voidable contracts which have been promptly repu-

diated by the stockholders) a single stockholder may maintain a bill for relief in behalf of his corporation similar to the present bill, in the event of his inability to procure the corporation to faithfully prosecute such a suit in its own behalf. While the business management of a corporation primarily belongs to its directors, and while, unless specially restrained, their powers necessarily include the exercise of a broad field of business discretion, yet that discretion must be lawfully and honestly exercised; they cannot give corporate property to themselves or to others, nor can the majority of stockholders sanction such an act. The transactions of a board which cannot be sustained against the will of a single stockholder, either with or without the sanction of the remaining stockholders, are acts which are either *ultra vires*, fraudulent or illegal. *United States Steel Corporation* v. *Hodge, supra.*

The transaction which is here challenged is the result of a resolution passed at a meeting of the board of directors in which five of the seven members of the board were present; these five directors were the five persons who had theretofore made the loans to their corporation. At the time the resolution was passed by them these five directors severally held notes which they had theretofore caused the corporation to execute to them for the money which they had loaned, and these notes were about to mature. These several notes pledged the stock here in question as collateral security for their payment. By the resolution which was then adopted the corporation was given one year in which to pay these notes, failing in which the collateral which secured the notes was to become the absolute property of these directors. It has been held that a contract between a pledgor and pledgee of the nature stated is void on grounds of public policy and inoperative to terminate the equity of redemption. *2 Kent Com. *583; Story Com. Bailm. § 345; 22 Am. & Eng. Encycl. L. (2d ed.) 877.* But assuming that no legal obstacle exists to prevent a pledgor from contracting with his pledgee that in consideration of an extended time for payment, the pledge shall automatically become the property of the pledgee in the event of failure to pay at the time agreed upon, providing the contract be found fair, open and intelligent, yet such a transaction necessarily demands

the closest possible scrutiny of a court of equity whose especial duty it is to guard and preserve equities of redemption against harsh or unconscionable conduct of creditors toward their debtors. See *31 Cyc. 858, 859*. The claim is made in this case that at the time this resolution was passed, and also at the time the period of redemption expired, the collateral here in question was worth about double the amount that it was pledged to secure. I incline to the view that this claim is well founded, but before reviewing the testimony on that subject, another concurrent element of the transaction will be here considered.

It will be observed that at the time the resolution which limited the period of redemption was adopted the individual interests of the five directors who passed the resolution were essentially hostile to the corporation in any effort made or to be made by them looking to the enforcement of the indebtedness. They could have sued the corporation for the recovery of the money due them. They could have sued to foreclose the equity of redemption of the corporation in the collateral. They could, possibly, have sold the collateral under the specific power contained in the instrument of pledge. But in any of these proceedings an absolutely essential prerequisite would have been such notice to the corporation as the circumstances demanded to fully and adequately disclose the fact of hostile proceedings against the corporation by those with whom the management and guardianship of the business interests of the corporation were for the time being primarily intrusted. This I understand to be the underlying principle upon which our court of errors and appeals bases its decision in *Marr* v. *Marr, 73 N. J. Eq. (3 Buch.) 643*. The proceedings which were in fact taken can scarcely be regarded as less hostile in their inherent nature than either of the three proceedings above suggested. Instead of pursuing either of the open remedies referred to an arbitrary date for forfeiture of title to the collateral was fixed, and that at a meeting of the board at which no director was present except those sustaining the relations of hostile interest. So far as the evidence discloses this resolution of forfeiture—it seems impossible to otherwise characterize it—was unknown to any other director or stockholder of the corporation until years after the period of redemption had ex-

pired; so far as practical notice to the corporation is concerned, the resolution may be said to have remained wholly in the breast of the men who adopted it until long after its terms became operative to vest absolute title in them. At the expiration of the period named for redemption there was no one other than these interested directors to even consider in behalf of the corporation the propriety of a redemption. At the expiration of the year no action was taken by the board in the nature of a consideration in behalf of the corporation of the propriety of redemption, and no thought appears to have been seriously given to that subject by anyone.

It is not intended by these observations to attribute bad faith to these five directors. On the contrary, it may well be doubted whether at the time referred to either of them really wanted the stock at the price. What is here made the basis of this decision is the principle of law which denies to directors of a corporation, who are its creditors holding collateral security, the right to in effect foreclose the equity of redemption of the corporation in the collateral without adequate notice to the corporation which they represent. If it be found that the value of the collateral was far in excess of the amount of the debt, the illegality of the transaction as against the will of a single dissenting stockholder becomes the more apparent.

After so long a period of time it is not easy to determine with accuracy what a fair market price for its capital stock may have been at the time here in question. The corporation was organized in the year 1896 with an authorized capital stock of the exact amount of the value of the land which it was proposed that the corporation should purchase. The land was then conveyed to the corporation, subject to a mortgage. Stock was issued to the vendors of the land to the amount of the purchase price less the amount of the mortgage. Stock to the amount of the mortgage was unissued; the plan being to retain that stock to meet the mortgage. The evidence is in harmony to the effect that the par value of the stock issued in payment for the land represented the real value of the land, in excess of the mortgage, at that time. The vendors of the land thereafter transferred a large percentage of the stock which had been issued to them to a trustee for the

corporation under a trust enabling the corporation to sell the trust stock to raise money for the purchase of additional land and for development purposes.   It is a part of this trustee stock which is now the subject of dispute.   Purchasers for this trustee stock were found from time to time at prices ranging from ninety-two to ninety-five dollars per share (par $100 per share), until the early part of the year 1898.   The resolution here in question was adopted October 5th, 1898, and if deemed operative to vest title to the stock in defendant directors in October, 1899, will confer title upon them at $50 per share.   No sale of either the trustee stock or of other stock of the corporation appears to have ever been made at less than in excess of ninety per cent. of its par value.   In September, 1899, Judge Endicott—one of the directors who was not present at the time the resolution in question was adopted and who testifies that he did not know of its adoption until shortly before this suit was brought—purchased of Charles F. Davis stock of the corporation for $150 per share. In 1900 he sold stock at $120 per share.   In 1903, and also in 1904, for $200 per share.   His testimony is to the effect that the value of the stock of the corporation steadily increased from the beginning.   Judge Thompson, the other absent director, sold stock in 1899 at par and also above par, and testifies that it has at no time been worth less than par.   There is testimony to the effect that in 1898 or 1899 stock was offered "on the street" for $50 per share, but no specific instances were given and no sales at less than $92 per share appear to have been made at any time. A resolution of the directors was adopted May 6th, 1897, to the effect that no company stock should be thereafter sold at less than par.   Whether this resolution refers to the trustee stock is not certain.   That resolution has at no time been rescinded.   While it is difficult, as already suggested, to at this time determine with accuracy what the market value of the stock in question may have been in 1898 and 1899, the evidence would seem to demand a finding that it was in excess of $90 per share, or approximately double the amount at which defendant directors took over the stock here in question.

It is strenuously urged in behalf of defendant directors that such laches is to be attributed to complainants as should be opera-

tive to afford a bar to relief under the present bill. It seems clear
that this defence cannot prevail. The rule, as stated in *Cook
on Stock.* § 685, is as follows:

"Laches is a defence only when the stockholder with a full knowledge
of the facts has delayed an unreasonable length of time in bringing his
action. These two elements, knowledge and delay, are the essential ele-
ments of the defence. Until the stockholder has full and complete knowl-
edge of all the essential facts which would be likely to induce him to
institute the action, the beginning of the time from which laches will
run cannot be said to commence. * * *  But it is not incumbent on
the stockholder to keep himself informed as to the various acts of the
corporation. He is not chargeable with knowledge merely because he
might have ascertained the facts by an examination of the corporate
books. Moreover, it is the well-established rule that lapse of time alone
cannot support the defence of laches. There must be both knowledge
and delay."

See, also, *2 Cook Corp.* § 731. No laches can be attributed to
some of the complainants. The fact that other complainants who
have joined in the bill are found to own stock the title to which
has passed through former owners to whom laches may be attrib-
uted can afford no bar to the assertion of the rights of the cor-
poration by complainants to whom no laches can be attributed.
The objection of laches of the individual stockholder goes to his
right to assert the property rights of the corporation; that right
cannot be impaired by the laches of another stockholder who may
have joined in the bill. The right of action is in no sense joint.
*Marr* v. *Marr, supra,* cannot be regarded as adverse to this view.
In *Marr* v. *Marr* the corporation was a defunct body and could
not for that reason be appropriately made the recipient of the
recovery.

The delay in this case has in fact caused no real injury to de-
fendants. The stock in question is still held by them except as
to one of them; as to that one, it is held by his grantee who holds
indemnity against the result of this suit. The recovery will
restore to defendant directors the money they loaned, with inter-
est, upon their returning the stock to the trustee from whom they
received it and returning to the treasury of the corporation the
dividends they have received on the stock.

I will advise a decree pursuant to the prayer of the bill.